AO 106 (Rev. 04/10) Application for a Search Warrant

## UNITED STATES DISTRICT COURT
for the
Western District of Arkansas

US DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FILED

MAR _5 2024

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

TWO CELLULAR TELEPHONES

)
)
)
)
)
)

Case No.

5:24 cm 21

By_____
Ronald E. Dowling
Deputy Clerk

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the ____Western____ District of ____Arkansas____, there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Controlled Substance Offenses |
| 21 U.S.C. 846 | Conspiracy |

The application is based on these facts:

See Attached Affidavit of DEA TFO Chase Young.

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DEA TFO Chase Young
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 5, 2024 @ 3:02 pm

_____
*Judge's signature*

City and state: Fayetteville, Arkansas

Hon. Christy Comstock, U.S. Magistrate Judge
*Printed name and title*

## **ATTACHMENT A**

### **TARGET TELEPHONE #1 TO BE SEARCHED**

One (1) gray colored T-Mobile cellular telephone, with an unknown International Mobile Equipment Identity (IMEI);

The cellular telephone described in Attachment A is currently stored as non-drug evidence at the DEA Fort Smith Post of Duty, in Fort Smith, Arkansas.



### TARGET TELEPHONE #2 TO BE SEARCHED

A black colored Samsung cellular telephone, with an unknown International Mobile Equipment Identity (IMEI);

The cellular telephone described in Attachment B is currently stored as non-drug evidence at the DEA Fort Smith Post of Duty, Fort Smith, Arkansas.



**ATTACHMENT B**

There is now being concealed certain property, namely evidence of violations of Title 21, United States Code, Section 841(a)(1)(possession with intent to distribute a controlled substance); and Title 21, United States Code, Section 846 (conspiracy to commit controlled substance offense). These offenses and proceeds earned from unlawful activities will be concealed or hidden to disguise the true nature, ownership, and control of the unlawful proceeds in furtherance of illegal activity including, but not by way of limitation, items of a specie hereinafter described as follows:

1.    Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

2.    All documents, including all temporary and permanent electronic files, records, and photographs (including, but not limited to, JPG, GIF, TIF, AVI, WAV and MPEG files), GPS data, which contain, attach, or describe a conspiracy to possess with intent to distribute a controlled substance or a conspiracy distribute a controlled substance, or the possession of a controlled substance or distribution of a controlled substance, as defined in 21 U.S.C. 841 and 846.

3.    User-attribution data to include data that reveals who used or controlled each device at or around the time that data reflecting criminal activity within the scope of this warrant was created, accessed, deleted, modified, copied, downloaded, uploaded or printed. User-attribution data includes registry information, user profiles and passwords, web-browsing history, cookies, electronic mail stored on the computer or device, electronic address books, calendars, instant messaging logs, electronically-stored photographs and video, file structure and user-created documents, including metadata.

IN THE UNITED STATES DISTRICT COURT
Western District of Arkansas, Fort Smith Division

| IN THE MATTER OF THE SEARCH OF TWO CELLULAR TELEPHONES | **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Chase Young, being first duly sworn, hereby depose and state as follows:

**PURPOSE OF AFFIDAVIT**

1.      I make this affidavit in support of an application for a search warrant under

Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A), gray colored T-Mobile

cellular telephone, with an unknown International Mobile Equipment Identity (IMEI),

(hereinafter, referred to as Target Telephone #1), currently stored as evidence within the Drug

Enforcement Administration's (DEA) Fort Smith Post of Duty (FSPOD), located in the Western

District of Arkansas. Photographs of the target telephone are attached to Attachment A, and;

a black colored Samsung cellular telephone, with an unknown International Mobile Equipment

Identity (IMEI), (hereinafter, referred to as Target Telephone #2), currently stored as evidence

within the Drug Enforcement Administration's (DEA) Fort Smith Post of Duty (FSPOD),

located in the Western District of Arkansas. Photographs of the target telephone are attached as

Attachment A.

2.      For the reasons set forth below, your affiant has probable cause to believe that the

target telephones contains items that constitute evidence, fruits, and instrumentalities of

violations of Title 21, United States Code, Section 841(a)(1)(distribution, possession with intent

to distribute a controlled substance); and Title 21, United States Code, Section 846 (conspiracy

to commit controlled substance offenses). Your affiant further submits that a search of the target

1

telephone will result in the discovery of items that constitute evidence, fruits, and instrumentalities of such activity.

3.      Based upon your affiant's training, experience, shared experience with other agents and officers with whom he has worked, and participation in other investigations involving large amounts of methamphetamine, cocaine, heroin, fentanyl, marijuana and/or other Controlled Substances, your affiant knows the following to be true:

a.      That drug distributors often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by law enforcement authorities;

b.      That even though these assets are in names other than the drug distributors', the drug distributors actually own and continue to use these assets, and exercise dominion and control over them;

c.      That drug distributors often possess large amounts of United States currency in order to maintain and finance their on-going drug business;

d.      That it is common for drug distributors to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

e.      That it is common for drug distributors to conceal contraband, proceeds of illegal drug sales, and records of drug transactions in secure locations within their residences, their

2

businesses, their vehicles, and/or other locations which they maintain dominion and control over for ready access, and to conceal these items from law enforcement authorities;

f.    That in-order-to accomplish this concealment, drug distributors frequently build "stash" places within their residences, vehicles, or businesses.  There are a number of publications available instructing where and how to build "stash" places.  Copies of these types of publications have been found in the residences of drug distributors;

g.    That it is common for persons involved in drug distribution to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals, and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers.  These items are maintained by the drug distributors within their residences, vehicles, businesses or other locations, which they maintain dominion and control over;

h.    That drug distributors often utilize electronic equipment such as cellular telephones, SIM cards, computers, flash drives, external hard drives, multimedia devices, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in items a, b, d, e, and g above, and q and r below;

3

i.      That when drug distributors amass large proceeds from the sale of drugs, the drug distributors may attempt to legitimize these profits through various money laundering methods.  To accomplish these goals, drug distributors utilize, including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations, business fronts, and otherwise legitimate businesses which generate large quantities of currency;

j.      That the sale of methamphetamine, cocaine, heroin, fentanyl, marijuana and other Controlled Dangerous Substances generates large quantities of United States currency in small denominations (commonly referred to as "street money");

k.      That it is common for drug distributors to physically handle and count the "street money" after receiving it in exchange for the Controlled Dangerous Substances, thereby leaving residue traces of Controlled Dangerous Substances on the "street money."  Law enforcement agencies utilize dogs which are trained to react to the odor of Controlled Dangerous Substances and residue traces of Controlled Dangerous Substances; and that those trained dogs have reacted to narcotics tainted currency negotiated at banks and concealed in the residences of narcotics traffickers;

l.      That it is common for drug distributors to separate their "street money" by denomination and put this currency in rubber banded stacks in varying increments to facilitate quick counting;

m.      That it is recognized, and Courts have held, that the small and medium denominations of questionable currency, along with the manner in which the currency is handled,

carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions, i.e. proceeds of illegal narcotic sales;

n.      That the Currency Transaction Report (CTR) (IRS Form 4789), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for drug distributors when they attempt to negotiate their illegal profits at financial institutions;

o.      That, in order to avoid the filing of a Currency Transaction Report, drug distributors often "structure" their currency transactions so that no one transaction exceeds $10,000, or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

p.      That drug distributors at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. In order to legitimize their spending, these distributors file tax returns reporting income commensurate with the amount of money they have spent during the year, which they feel, can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses;

q.      That distributors of illegal drugs commonly maintain addresses or telephone numbers in books or papers ("ledgers") which reflect names, addresses and/or telephone numbers of their associates in the drug trafficking organization;

2

r.      That drug distributors take or cause to be taken photographs of themselves, their associates, their property and their product. That these distributors usually maintain these photographs in their possession, or in their residences and/or vehicles;

s.      That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

t.      That drug distributors commonly have in their possession, that is, on their person, at their residences, in their vehicles, and/or their businesses, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Said firearms are used to protect and secure a drug distributor's property. Such property may include, but is not limited to: illegal drugs, jewelry, vehicles, narcotics paraphernalia, books, records, and United States currency;

u.      That the target(s) of this investigation are engaged in long-term, continuing criminal activities, namely offenses involving the distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), conspiracy to commit the aforementioned crimes, in violation of Title 21, United States Code, Section 846; and Title 18, United States Code, Section 1956(a)(1) (Laundering of Monetary Instruments)

v.      That the evidence sought through the use of the search warrant listed herein will provide investigators with admissible evidence of these crimes needed to establish the full scope and nature of the offenses being investigated; including determining the identity of members of the organization, the sources of supply, transportation methods, locations used to conceal drugs and the assets purchased from the proceeds derived from the sale of drugs; and,

3

w.    That there is probable cause to believe that such items of evidence, which represent the fruits and instrumentalities of said offenses, will be located within the location specified in this application, which is located within the Western District of Arkansas.

4.    The information contained in this affidavit is based upon information provided by other DEA special agents/TFOs, other federal, state and local law enforcement officers, public source documents, and your affiant's own personal investigation. The information contained in this affidavit is submitted for the sole purpose of establishing probable cause for a certain search warrant mentioned herein. As a result, it does not contain every fact known to me concerning this investigation.

## INTRODUCTION AND AGENT BACKGROUND

5.    Affiant is a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration ("DEA") and has been assigned to the DEA since August 2022. Your affiant is a criminal investigator for the United States within the meaning of Title 21, United States Code, Section 878, and therefore your affiant is empowered to conduct investigations of, and make arrests for, the offenses enumerated in Title 21. Accordingly, your affiant is a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a seizure warrant.

6.    In addition to your affiant's assignment to the DEA, your affiant has been employed by the Crawford County, Arkansas, Sheriff's Office since 2013. During your affiant's employment with the Crawford County Sheriff's Office, your affiant has been assigned to the DEA Fort Smith Post of Duty as a Task Force Officer (TFO) since August 2022. Prior to your affiant's assignment as a DEA TFO, your affiant has been assigned to the Crawford County

4

Sheriff's Office Criminal Investigations Division (CID), working drug investigations. Your affiant has been involved in numerous aspects of drug investigations, including, but not limited to, conducting controlled purchases of narcotics; utilizing confidential sources; debriefing defendants, witnesses, and informants; conducting surveillance and undercover operations; preparing and executing search warrants; analyzing documentary and physical evidence, analyzing phone toll records.

7.    In the course of your affiant's career, your affiant has been the affiant of, and/or participated in, numerous search warrants involving the law enforcement seizure of controlled substances, documents associated with the sale of controlled substances and proceeds from the sale of illicit drugs.

8.    Your affiant has personally conducted and/or assisted investigations of criminal violations involving violations of the Federal Controlled Substances Act (Title 21, U.S.C. 841(a)(1) et. al.).

## **PROBABLE CAUSE**

9.    On February 22, 2024, Investigators with DEA Fort Smith Post of Duty (FSPOD) along with DEA Fayetteville Resident Office (FRO) and other local law enforcement agencies, executed a search and seizure warrant issued by this Court in WDAR Case Number 5:24 CM 8[1] at 1006 White Road, Springdale, Arkansas, 72762.

10.    The residence was determined to contain four (4) occupants, one of which fled on foot as law enforcement began execution of the search warrant.  The individual who fled on foot from the residence was an individual whom had participated in selling fentanyl pills to a confidential source on multiple previous occasions, as described in the search warrant affidavit

---

[1] The Affidavit filed in WDAR Case No. 5:24 CM 8 is incorporated by reference as if set out word-for-word herein.

filed in WDAR Case No. 5:24 CM 8, incorporated by reference. This individual was apprehended after a brief foot chase by Morgan Abernathy and John Billingsly, Investigators with the State of Arkansas 4th Judicial Drug Task Force (JDTF). This individual was arrested and later identified as Cristian JIMENEZ-Villela by documents located during the service of the search warrant, as discussed below. During a search of JIMENEZ by the same Investigators from the 4th JDTF, it was found that JIMENEZ was in possession of a set of keys,[2] $4,055.00 in U.S. currency and Target Telephone #1.

11.     The other three (3) individuals located during the search of the residence were detained by Investigators during the service of the search warrant. These occupants were placed in wrist restraints and were escorted to the living room for observation. In one of the bedrooms of the residence, investigators located a dark colored lockbox. The key to this lockbox was located on the key ring that was on JIMINEZ's person when he was apprehended, along with the key to the Kia automobile, described above. When opened, the box contained a small white bag that containing a substance consistent with suspected Fentanyl powder. The lockbox also contained suspected drug residue and a small set of digital scales.

12.     Also located in the bedroom, a Reebok hoodie and a pair of gray and white shoes were also located. These items of clothing had been previously worn by JIMINEZ during drug trafficking activities described in 5:24 CM 8. Also located in the bedroom was a Mexico Identification card with the name Cristian JIMENEZ-Villela and a large dark colored weigh scale with residue and a black bag bundled in gray tape with suspected drug residue, believed to be packaging material for a past supply of controlled substances that had been previously sold by JIMINEZ.

_____

[2] One of the keys in Jiminez's possession was to a Kia automobile which was utilized in the controlled purchases of fentanyl described in WDAR Case No. 5:24 CM 8, incorporated by reference above.

6

13.     The three (3) other occupants inside of the residence that were detained during the execution of the search warrant determined to have no involvement in JIMINEZ's drug trafficking activities and released. Just prior to investigators departing this residence, one of these three residents, Walter CARPIO, requested to speak with investigators. CARPIO stated that as law enforcement were beginning to execute the search warrant, but before JIMENEZ fled from this residence, CARPIO observed JIMENEZ in the kitchen area of the residence placing an unknown item in a small space above the kitchen cabinets. CARPIO stated once he was released from detainment from law enforcement, he began hearing an alarm type ringing coming from above the kitchen cabinets and retrieved a cellular telephone from above the cabinets, which CARPIO handed it to affiant, as witnessed by DEA SA Michael Brooks. CARPIO stated that he believed this was the item he observed JIMENEZ attempting to hide above the kitchen cabinets. This cellular telephone is Target Telephone #2.

14.     JIMENEZ was later transported to the Washington County, Arkansas, Detention Center, and was booked on State of Arkansas felony charges. Target Telephone #1 and Target Telephone #2 remain in the secure custody of the Drug Enforcement Administration.

15.     From training and by conducting numerous drug trafficking investigations, your Affiant is aware that traffickers of illegal narcotics frequently utilize cellular telephones to facilitate the purchase, transportation, and/or distribution of illegal narcotics. Specifically, your Affiant is aware the drug traffickers utilize multiple cellular telephones to communicate with co-conspirators during the transport of illegal narcotics to avoid detection and to differentiate between types of transactions, end-user and sources of supply. Furthermore, cellular telephones frequently contain names, text messages, voice mail messages, photographs, videos, and contact numbers for/of others involved in the distribution of illegal narcotics.

7

16.     Further, it is both your Affiant's experience and the experience of other law enforcement officers your Affiant has spoken with, that a conspiracy to traffic narcotics generates various types of cellular telephone-related evidence.  For example, the following types of evidence may be generated during the conspiracy: (1) telephone and direct contact numbers; (2) identifying information assigned to the device (including usernames, passwords and e-mail addresses); (3) call detail information (outgoing/incoming/missed calls); (4) internet protocol addresses accessed by the device or accessing the device; (5) stored photographs, videos and text messages; (6) stored electronic mail, including attachments, and voice messages and other recordings; (7) web browsing history and any stored web pages; (8) stored documents and other files; (9) stored geo-location information; and (10) data stored in any application.

17.     Based upon your Affiant's training and experience, your Affiant also knows that members of DTOs, including dealers, often use mobile phones to communicate with their narcotics source of supply and delivery recipients. Drug distributors often use SMS text messaging to communicate arrival and departure times, meeting places, details about narcotics, and details about other co-conspirators involved in the distribution of narcotics. Your Affiant has also observed drug distributors who photograph large sums of U.S. Currency and/or narcotics, which are then stored on the mobile device.

18.     Based upon your Affiant's training and experience, your Affiant's review of documents and other relevant information your Affiant believes to be reliable, discussions with other law enforcement officers and the facts supporting probable cause set as forth herein, your Affiant believes that evidence of the violation of Title 21, United States Code, Section 841(a) (1) (possession with intent to distribute a controlled substance), and Title 21, United States Code,

Section 846 (conspiracy to commit controlled substance offense) is presently located on or within the cellular telephone device, described in Attachment A.

## TECHNICAL TERMS

19.     Based on your Affiant's training and experience, your Affiant uses the following technical terms to convey the following meanings:

a.      Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.      Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory

9

cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

10

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

Based on my training, experience, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and has internet capabilities. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the

11

Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

**Nature of examination**: Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

**Manner of execution**: Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## <u>CONCLUSION</u>

24.     Based on the above information, your affiant has reason to believe that concealed within the Target Telephones which are further described in Attachment A are items that constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1)(possession with intent to distribute a controlled substance), and Title 21, United States Code, Section 846 (conspiracy to commit controlled substance offense). Your Affiant further believes that a search of these target telephones will result in the discovery of items that constitute evidence, fruits, and instrumentalities of these activities, specifically, the items listed in Attachment B.

13

Further your Affiant sayeth not.

Respectfully submitted,

_____
Chase Young
DEA Task Force Officer

Subscribed and sworn to before me on ~~February~~ March 5 __, 2024

_____
HONORABLE CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE

14